IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CYNTHIA R. LINTZ, )
 )
    Plaintiff, )
 )
-vs- ) Civil Action No. 08-424
 )
MICHAEL J. ASTRUE, )
COMMISSIONER OF SOCIAL SECURITY, )
 )
    Defendant. )

**MEMORANDUM and ORDER**

Gary L. Lancaster,
District Judge.                                                                                                              May 11, 2009

    This is an appeal from the final decision of the Commissioner of Social Security denying plaintiff's claim for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title IV of the Social Security Act. Jurisdiction is proper pursuant to 42 U.S.C. § 405 (g) and 42 U.S.C. §1383 (c)(3) . Plaintiff, Cynthia Lintz, alleges that the Administrative Law Judge's ("ALJ") decision that she is not disabled, and therefore not entitled to disability insurance benefits and supplemental security income, should be reversed or in the alternative remanded because the ALJ improperly disregarded the medical opinion of plaintiff's treating physician, improperly determined plaintiff's residual functional capacity, improperly determined that plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible, and improperly relied on an incomplete hypothetical question. For the reasons that follow the Court will vacate the ALJ's decision and remand this case to the Commissioner for further evaluation.

**I.    Factual History**

    In February 1990, plaintiff was involved in an automobile accident and claims that her recurrent pain in her lower back, legs, hips, neck, and shoulders, and headaches, numbness in the

right wrist, arm, and the legs stems from this accident. (R.at 113). The earliest medical record is that of Dr. Chatta from June 25, 2001, where plaintiff reported that she was suffering from leg pain that had been happening intermittently for years and Dr. Chatta noted calf tenderness, but no edema, erythma, or warmth. (R. at 127). Plaintiff's next medical records were from September 6, 2004 when she was seen by Dr. J.H. Kim for an orthopedic consultative examination. (R. at 113-119). Dr. Kim reported that plaintiff had a normal range of motion in her cervical spine, upper extremities, and hips. (R.at 113). Dr. Kim indicated a positive Homan's sign that was "somewhat present." (R.at 113-115). X-rays of the lumbosacral spines, cervical spines, and pelvis were unremarkable. (R.at 115).[1] On September 10, 2004, plaintiff saw Dr. Chatta for the completion of a Medical Assessment Form. (R. at 151-52). Dr. Chatta also ordered testing and plaintiff underwent a venous duplex doppler ultrasound which showed no evidence of DVT or venous insufficiency in her lower extremities. (R. at 130). On September 13, 2004, she also underwent a lumbar spine x-ray which was remarkable for a mild exaggeration of her normal lumbar lordosis; a thoracic spine x-ray which revealed early degenerative changes; and blood work which was negative. (R. at 123, 128, 129).

On September 17, 2004, plaintiff returned to Dr. Chatta who reviewed Plaintiff's test results and indicated that all tests were normal or negative except for "mild arthritis" in the thoracic spine and some muscle spasm in the lower back. (R. at 123-4). Plaintiff complained of fatigue, lack of energy, discomfort in her arms, legs and back, especially when standing and sometimes when sitting. (R. at 123). Plaintiff also indicated a history of recurrent headaches, particularly in the back of the head, which were associated with photophobia. (R. at 123). Chatta indicated that the plaintiff's leg and back pain symptoms "sound[ed]" like fibromyalgia and chronic fatigue and referred her to a rheumatologist for evaluation. (R. at 123). Plaintiff was also prescribed Amitriptyline for complaints of headaches and problems sleeping. (R. at 124). On November 8, 2004, plaintiff was seen by Devashis A. Mitra, D.M., for consultation for diffuse aches and pains in multiple joints and soft tissues. (R. at 185-88). Dr. Mitra indicated

---

[1] Dr. Kim filled out a physical capacity evaluation for Plaintiff indicating that she could frequently lift 20 pounds and occasionally lift 25 pounds and could frequently carry 10 pounds and occasionally carry 20 pounds. (R. at 117). He further indicated that Plaintiff could stand for 1-2 hours per day due to calf pain and could sit for six hours in a day. (R. at 117). Plaintiff's pushing and pulling was unlimited, but she could never crouch, balance, or climb due to calf pain and her reaching was affected by her pain. (R. at 117-19).

"Paresthesiae mainly in the right upper extremity and left lower extremity." (R. at 185). He noted soft tissue tenderness at twelve of eighteen trigger points indicating that plaintiff met the ACR criteria for fibromyalgia and that multiple joints had painful range-of motion and the lower back had paraspinal tenderness. (R. at 185). His impression was that plaintiff had 1) polyarthralgias, 2) fibromyalgia, 3) sleep difficulty; and paresthesiae. (R. at 185). Mitra added Robaxin as a medication and indicated that he would evaluate her joint symptoms with a bone scan. (R. at 185). Additionally, he indicated that paresthesiae would be evaluated with a nerve study and also suggested an MRI of the lumbar spine. (R. at 185). On the same date, Dr. Chatta increased the dosage of plaintiff's Amitriptyline on continuing complaints of pain, insomnia, and headaches. (R. at 215). On November 15, 2004, a functional capacity assessment was completed by a Disability Determination Service medical consultant, Dr. Gregory Mortimer. (R. at 134-141). Dr. Mortimer indicated that plaintiff could lift 20 pounds occasionally and 10 pounds frequently, could stand and walk for about 6 hours in an eight hour work day, could sit about 6 hours in an eight hour work day, and had unlimited function for pushing and pulling. (R. at 135). Dr. Mortimer further indicated that plaintiff had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. (R. at 136-9).

Plaintiff underwent a nerve conduction study (NCS) and EMG as requested by Dr. Mitra. (R. at 181-83). The studies were conducted by Dr. Ronald Zimmerman and indicated "no electrical findings for cervical radiculopathy, lumbar radiculopathy, polyneuropathy, carpal tunnel syndrome, or myopathy." (R. at 183). The results of her whole body bone scan were also negative. (R. at 181). Dr. Chatta referred plaintiff for three sessions of physical therapy for her complaints of pain. (R. at 158-60, 212). At her first visit, plaintiff reported pain levels of 6/10-8/10. (R. at 158). The therapist indicated that "patient could not tolerate laying on either side or on her stomach. Her movements were slow and painful during the evaluation." (R. at 159). Plaintiff had her last physical therapy visit on January 25, 2005. (R. at 157). Plaintiff told the physical therapist that she felt okay doing exercises in the pool but that no changes had occurred otherwise and indicated pain on the level of 5/10 through 9/10. (R. at 157). On February 11, 2005, plaintiff returned to Dr. Mitra who indicated that the intensity of the pain had decreased from the last visit due to her medications. He indicated that plaintiff was experiencing

3

drowsiness from her muscle relaxant. Since plaintiff was still experiencing back pain, an MRI was ordered to further rule out other the causes of her back pain. (R. at 180). On March 16, 2005, Plaintiff underwent an MRI of her lumbar spine, which was negative. (R. at 179).

On March 8, 2005, Plaintiff was seen by Dr. Chatta who indicated that plaintiff was still experiencing "a lot of pain in her back and neck area especially when there is wet weather. She complains of pain in her legs...." (R. at 205). Plaintiff indicated that she was only taking her muscle relaxants at bedtime because they made her groggy during the day. (R. at 205). Dr. Chatta suggested that plaintiff try to do water exercises to increase her mobility and help her lose weight. (R. at 205). On April 22, 2005, plaintiff was referred to Dr. Perschke for a painful right foot and he indicated that plaintiff had swelling and pain indicative of heel spur syndrome and paroneal tendonitis of the right foot. (R. at 256). Plaintiff received injections of Dexamethasone Phosphate and Lidocaine on four occasions, but on June 17, 2005, he indicated that the injection therapy failed to relieve her pain and she was referred to physical therapy. (R. at 251-54). On August 1, 2005, plaintiff returned to Dr. Mitra and he reported a decrease in Plaintiff's pain from the last visit to a mild level, but she reported excessive drowsiness from her medications. (R. at 178). Plaintiff was positive for fatigue and mild stiffness and had scattered areas of tender points on her upper and lower back. (R. at 178). Mitra further noted a painful rate of motion with crepitus but no effusion in the knees. (R. at 178). Ketoprofen was added for the knee pain. (R. at 178). Mitra noted his impression as fibromyalgia, sleep difficulty, knee pain/osteoarthritis knees, and medication monitoring. (R. at 178).

Plaintiff saw Dr. D. Kelly Agnew, an orthopedic surgeon, for her knee pain on August 17, 2005. (R. at 229-30). Agnew noted a "minimally antalgic gait," crepitants at the patellofemoral surfaces, patellofemoral irritability, well-maintained knee motion, no joint line tenderness, stable knees, non-tender calves, and that Plaintiff was intact neurologically. (R. at 229). Upon review of plaintiff's x-rays, Dr. Agnew determined that Plaintiff showed "mild degenerative changes.(R. at 229). Plaintiff was injected with a local analgesic. (R. at 230). On September 19, 2005, plaintiff returned to Dr. Agnew and reported that ketoprofen, the injection, and home exercises did not help with the pain. (R. at 228). Dr. Agnew ordered Supartz injections for Plaintiff. (R. at 228).On October 3, 2005, plaintiff was administered her first injection into the right knee. (R. at 227). She received additional injections on October 10, 17, and 24,

2005.(R. at 225-27). Plaintiff noticed no improvement after her first injection. (R. at 227). After her second injection, she reported 50% relief and after her third, she reported the same. (R. at 224-25). At her final injection on October, 31, 2005, she reported her improvement was 70%. (R. at 223).

On February 1, 2006, Plaintiff was seen again by Dr. Mitra and indicated that her pain was moderate to severe and diffuse on the whole and that she was still experiencing sleep difficulties. He indicated that she had run out of her medications and refilled the ketoprofen and Robaxin and added Ultram. Upon examination, plaintiff was found to have diffuse soft tissue tender points along the upper and lower extremities, nape of neck, hips and lower back. Mitra also indicated that she had muscle spasms in the subrascapular area. He gave her an injection of Depomedrol. (R. at 175). On May 12, 2006, Plaintiff was seen by Dr. Chatta where she reported that her fibromyalgia was doing much better since being put on a muscle relaxant. However, plaintiff indicated that she still had a lot of knee, back, and neck pain. Chatta indicated that the cartilage injections only helped plaintiff minimally. Plaintiff indicated that she was having numbness in her hands at night, which she was given a splint for. Chatta noted that plaintiff was doing "okay." (R. at 124). On June 2, 2006, plaintiff was seen again by Dr. Mitra. He indicated that "Right suprascapular injection last visit was helpful. The intensity of the pain is currently moderate and diffuse on the whole. The worst area is the left knee with locking and difficulty stairclimbing, but no swelling. The pain is localized without any radiation. She had FIUA right knee by orthopedics in December without benefit. Chronic ulnar paresthesias, increasing on the R with decreased grip. Gloves have been helpful on the L." (R. at 173). X-rays of both knees were performed on June 5, 2006 with the left knee indicating mild medial joint space narrowing and the right knee indicating very mild medial joint space narrowing. (R. at 171-72).

On August 7, 2006, Dr. Bowden, plaintiff's chiropractor completed a physical capacity evaluation form for plaintiff. (R. at 234-39). On August 8, 2006, Dr. Chatta completed a physical capacity evaluation form for plaintiff. (R. at 231-33). On October 25, 2006, the State agency referred plaintiff to Dr. Uran for a consultative psychological evaluation. (R. at 241-49). Plaintiff was assessed with anxiety disorder, NOS and depressive disorder, NOS. (R. at 243). She was further assessed with a Global Assessment of Functioning (GAF) of 60. (R. at 243). Dr. Uran determined that plaintiff would have "Slight" restriction in her ability to make judgment on

simple work-related decisions, interact appropriately with supervisors; and respond appropriately to changes in a routine work setting. She further determined that plaintiff would have "Moderate" restriction in her ability to understand, remember and carry out detailed instructions; interact with the public and co-workers; and respond appropriately to work pressures in a usual work setting. (R. at 248). On December 11, 2006, plaintiff was seen again by Dr. Mitra who indicated that "the intensity of the pain has increased somewhat compared to the previous visit. The pain is currently moderate. Most notable pain with spasm paracervical/trapezius and low back into the buttocks and posterolateral hips. Increasing functional problems with diminished grip and nocturnal paresthesias." (R. at 270).

At the first hearing before the ALJ on August 9, 2006, plaintiff testified that she believed she was unable to work because of the recurrent pain that required her to lay down often during the day. (R. at 298-99). She indicated that she meets with a support group of people that suffer from the same condition. (R. at 301). Plaintiff last worked part-time as a school bus driver in 1998 and quit that job because the pain was starting to get more severe. (R. at 302-303). Plaintiff testified that she could do a little bit of cleaning including dusting and sweeping the kitchen. She further indicated that she usually made one meal a day, unless she was in too much pain and then her husband would do it. (R. at 305). She required assistance in shopping and doing laundry. (R. at 305). She indicated that she could lift 5-10 pounds and walk for about five minutes before resting and can stand for about fifteen minutes. (R. at 306). She stated that, despite being medicated, she was having trouble sleeping for long periods of time. (R. at 307). She further testified that she had experienced some relief from her migraine headache medication, but that it only lasted for a month and then they came back and were now more severe. (R. at 307). She indicated that her migraine headaches usually encompassed nausea, inability to deal with light, and the need to go to bed with a rag on her head somewhere quiet and dark. She further indicated that afterwards she would have a lot of fatigue and that these headaches were coming once a week. (R. at 307-313). She testified that she could no longer complete her hobbies of putting together puzzles and cross-stitching because she was not able to utilize her fingers in that way. (R. at 308). Plaintiff agreed with Dr. Chatta's assessment of her functional capacity, and also testified that she had received injections for pain that were not helpful. (R. at 312, 314-15).

Additionally, she testified that her hands go numb at night and that she has to wear hand splints. (R. at 312).

## II. Procedural History

Plaintiff protectively filed an application for disability insurance benefits and supplemental security income on June 15, 2004. (R. at 64-6, 259-63). Plaintiff alleged disability beginning November 30, 1998. R. 20. Plaintiff's date last insured (DLI) under the Act was December 31, 2003. (R. at 67-8). Therefore to be eligible for disability insurance benefits, she had to prove that she was disabled from that date. 42 U.S.C. § 423 (a), (c). Plaintiff's insured status was not relevant to her claim for SSI. After plaintiff's initial claims were denied, two hearings were held before the ALJ. (R. at 315-371). Plaintiff, who was represented by counsel, testified at the hearing on August 9, 2006. (R. at 294-317). At the second hearing on February 28, 2007, Plaintiff, Dr. Phillip Balk, M.D., an impartial medical expert, and Charles Cohen, Ph.D., and impartial vocational expert (VE) testified. (R. 318-48). On April 13, 2007, the ALJ found that plaintiff was not disabled. (R. 20-27). Plaintiff submitted additional evidence to the Appeals Council, but the Appeals Council found no basis for changing the ALJ's decision and denied plaintiff's request for review on January 25, 2008. (R. at 6-9). After thus exhausting her administrative remedies, plaintiff commenced this action against the Commissioner pursuant to 42 U.S.C. § 405 (g) and 42 U.S.C. §§1318-1383f.

When resolving the issue of whether a claimant is disabled and whether a claimant is entitled to DIB benefits, the Social Security Administration applies a five step analysis. 20 C.F.R. § 404.1520 (a). The ALJ must determine: (1) whether the claimant is currently engaging in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if the claimant has a severe impairment whether it meets or equals the criteria listed in 20 C.F.R. pt. 404. subpt. P, app. 1; (4) if the impairment does not satisfy one of the impairment listings, whether the claimant's impairments prevent her from performing her past relevant work; and (5) if the claimant is incapable of performing her past relevant work, whether she can perform any other work which exists in the national economy, in light of his age, education, work experience and residual functional capacity. 20 C.F.R. § 404.1520. In all but the final step, the burden of proof is on the claimant. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).

In this case, the ALJ determined that plaintiff was not disabled at the fifth step of the sequential evaluation process. (R. at 20-27). He concluded that plaintiff suffered from fibromyalgia, degenerative joint disease (DJD) thoracic spine, left calf pain, and migraines, which were deemed to be a combination of severe impairments under 20 C.F.R. §§ 404.1520 (c) and 416.920(c). (R. at 22). The ALJ determined, however, that these impairments did not meet or medically equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 23). The ALJ concluded that plaintiff was unable to perform any past relevant work. (R. at 26). Furthermore, he determined that plaintiff could perform a full range of light work, and that jobs falling within the confines of her residual functional capacity existed in significant numbers in the national economy. (R. at 26-7).

**III. Analysis**

In support of her motion for summary judgment, plaintiff makes four arguments. First, she argues that the ALJ improperly disregarded the medical opinions of Dr. Fozia Chatta, M.D. and Dr. Bowden, plaintiff's chiropractor. (Br. for Plaintiff at 19-24). Second, she contends that the ALJ improperly determined that she could perform light work in contradiction of the medical evidence. ( Id. at 24-26). Third, plaintiff argues that the ALJ improperly determined that her statements were not entirely credible by ignoring her consistent complaints of pain and the medical evidence. (Id. at 26-27). Finally, plaintiff claims that the ALJ relied on an incomplete hypothetical question to the vocational expert by ignoring the opinions of Dr. Chatta and Dr. Bowden. (Id. at 28-30). The Court will proceed to address each argument.

Plaintiff alleges that the ALJ failed to properly assess her residual functional capacity because the ALJ erroneously discredited Plaintiff's testimony and the assessments of two of her

treating doctors, Dr. Chatta[2] and Dr. Bowden[3]. Specifically, Plaintiff argues that the "overwhelming medical evidence in this case supports the conclusion that Plaintiff is unable to perform substantial gainful activity." (Br. for Plaintiff, p. 24). In rejecting the opinions of Dr. Chatta and Dr. Bowden and finding plaintiff's statements to be not entirely credible, the ALJ stated:

> Dr. Chatta noted that the claimant's migraine headaches had improved with medication, so they could be controlled (Exhibit 8F). Electrodiagnostic testing (i.e., EMG/NCS, MRI, Doppler Ultrasound) was normal. There is no evidence of neurological deficits. There are no signs of muscle atrophy, indicating that she moves around in a fairly normal manner. She has not participated in a pain management program. She admitted in her testimony that she experiences no side effects from medication. She testified that she is able to do some household chores, drives, shop, and socialize with friends on a regular basis. Based on the above, I reject the assessments of Dr. Chatta and Gary Bowden, D.C. The latter is a chiropractor which is not an acceptable medical source (20 CFR 404.1513 and 416.913). Dr. Chatta, on September 10, 2004, opined that the claimant was "Temporarily Incapacitated."

---

[2] On September 10, 2004, Dr. Chatta indicated that plaintiff was "temporarily incapacitated" until September 10, 2005 because of chronic back and leg pain and chronic headaches. She also indicated that plaintiff was functionally limited in her ability to sit, stand, or walk for long periods of time and could not lift. (R. at 151-52). She later completed a Physical Capacity Evaluation for plaintiff indicating that plaintiff would only be able to stand continuously for 15 minutes, walk continuously for 10 minutes, and sit continuously for 30 minutes per hour in an eight hour day. (R.at 231). She further assessed that plaintiff could only stand for two hours and sit for three hours in an eight hour workday and could alternatively sit and stand for a total of five hours per workday. (R.at 232). Chatta also assessed that plaintiff would need to lie down for three hours during the workday. (R.at 232). Plaintiff could lift 5-10 pounds, but could not use her hands for fine manipulation or pushing and pulling and could never climb, stoop, balance, crouch, kneel, or crawl. (R.at 232). When asked for objective medical evidence to support these findings, Dr. Chatta wrote, "she was seen by specialist who confirmed diagnosis of fibromyalgia." (R.at 233).

[3] On August 7 2006, Dr. Bowden, Plaintiff's chiropractor, filled out a Physical Capacity Evaluation indicating that Plaintiff's present medical diagnoses was fibromyalgia. (R.at 234). He indicated that plaintiff would only be able to stand continuously for 15 minutes, walk continuously for 10 minutes, and sit continuously for 30 minutes per hour in an eight hour day. (R.at 234). He further assessed that plaintiff could only stand for two hours and sit for three hours in an eight hours workday and could alternatively sit and stand for a total of five hours per workday. (R.at 234). Bowden also assessed that plaintiff would need to lie down for three hours during the workday. (R.at 235). Plaintiff could lift 5-10 pounds, but could not use her hands for pushing and pulling. (R.at 235). On the same date, Dr. Bowden completed a Physical Capacity Evaluation indicating plaintiff's medical diagnoses as of December 1, 2003 as being fibromyalgia. (R.at 237). He indicated that, at that time, Plaintiff could only stand continuously for 15 minutes, walk continuously for 5 minutes, and sit continuously for 30 minutes per hour in an eight hour day. (R.at 237). He further assessed that plaintiff could only stand for three hours and sit for one hour in an eight hours workday and could alternatively sit and stand for a total of four hours per workday. (R.at 237). Bowden also assessed that plaintiff would need to lie down for four hours during the workday. (R.at 238). Plaintiff could lift 5-10 pounds, but could not use her hands for pushing and pulling or fine manipulation. (R.at 238).

> However, he did not provide any basis in the medical record to
> support this allegation that was made on a form provided by the
> Pennsylvania Department of Public Welfare and required to be
> filled out *(sic)* those seeking public assistance. Based on the
> objective medical evidence of record, I reject this opinion. (Exhibit
> 5F)....Dr. Balk testified that, with regard to fibromyalgia, the
> claimant has in the medical record confirmed 18 tender points on
> her limbs. He noted her long history of pain in her low and mid
> back. He reported that she has neck pain and migraine headaches
> as well as numbness in her hands and weakness. Dr. Balk opined
> that an individual with these symptoms should not be adversely
> affected with regard to their functional capacities.
>
> The Disability Determination Service (DDS) medical consultants
> found that the claimant could do light work. I find this DDS
> assessment to be generally consistent with the evidence of record
> and worth of substantial probative weight. (Exhibit 3F)

(R.at 25, 26).

The Court's assessment of whether the ALJ properly credited the testimony of Plaintiff and the opinions of Plaintiff's treating physicians in determining Plaintiff's residual functional capacity depends on two guiding principles. First, great weight must be given to a claimant's testimony regarding her subjective pain, especially when that testimony is supported by competent medical evidence. *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 n.10 (3d Cir. 1997). ("Where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount claimant's pain without contrary medical evidence.") Second, the ALJ is subject to the "Treating Physician Doctrine," whereby the ALJ must accord the reports of treating physicians great weight, especially in instances "where their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)(internal citations omitted). Therefore, reports of a treating physician and the subjective complaints of a Plaintiff cannot be discredited unless contrary medical evidence exists in the record. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993).

These principles must be applied when the ALJ addressed the weight to be given to the testimony of Plaintiff and the reports of Plaintiff's treating physicians, especially in a case such as this one, that involves a diagnosis of fibromyalgia. "Fibromyalgia syndrome is a common and

chronic disorder characterized by widespread muscle pain, fatigue, and multiple tender points....Tender points are specific places on the body-on the neck, shoulders, back, hips, and upper and lower extremities, where people with fibromyalgia feel pain in response to slight pressure." National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institutes of Health, Questions and Answers About Fibromyalgia, http://www.niams.nih.gov/health_info/fibromyalgia/default.asp (last visited May 5, 2009). "Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community. The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms. The American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis." *Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004). In fact, fibromyalgia patients often "manifest normal muscle strength and neurological reactions and have a full range of motion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 244 (6th Cir. 2007)(citing *Preston v. Secretary of Health and Human Services*, 854 F.2d 815, 820 (6th Cir. 1988). In order to diagnose fibromyalgia, a series of focal points must be tested for tenderness and other conditions must be ruled out through objective medical and clinical trials. *Id.* at 244. Symptoms associated with fibromyalgia include "pain all over," fatigue, disturbed sleep, stiffness, and tenderness occurring at eleven of eighteen focal points. *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996).

**Plaintiff's Testimony and Reports of Treating Physician and Chiropractor**

The ALJ heard testimony from plaintiff and received medical records from two of plaintiff's medical doctors, Dr. Chatta and Dr. Mitra, indicating that Plaintiff suffered from fibromyalgia, arthritis, and migraine headaches. Dr. Chatta opined that plaintiff's residual functional capacity was subject to a number of severe limitations due to her fibromyalgia, chronic headaches, chronic back and neck pain, fatigue, and arthritis. For a plaintiff to have a residual functional capacity, he or she must be capable of working on a regular and continuing basis. *See* 20 C.F.R. § 404.1545(b) (residual functional capacity determined for "work activity on regular and continuing basis"); Social Security Ruling 96-8p (requiring ALJ to evaluate claimant's ability to engage in work for 8 hours a day and 5 days a week). Plaintiff testified that she last worked part-time as a school bus driver in 1998. (R. 302-303). Plaintiff testified that she quit that job because of the stress and increasingly severe pain. (R. 302-303). Plaintiff testified

11

that she experiences pain in her neck, back, legs, knees, and numbness in her hands and buttocks. (R. 299, 306, 309, 313). Due to the pain, fatigue, and difficulty sleeping at night, plaintiff lays down for three hours a day. (R. 299). She also experiences migraine headaches once a week that require her to be in complete darkness for a large part of the day and end in further fatigue. (R. 307). Plaintiff took various medications and injections after her diagnoses to attempt to alleviate the pain, but these remedies provided only temporary relief. (R. 307, 312, 314-15). Plaintiff admitted that she is capable of doing certain activities such as dusting, sweeping the kitchen, and making one meal a day. She further can do some shopping and laundry with assistance. However, if the pain is too great, someone else must perform these chores. (R. 305). She also belongs to a support group of people that have the same condition. (R. 301).

Plaintiff's treating physician, Dr. Chatta and treating chiropractor, Dr. Bowden, indicated the severity of plaintiff's fibromyalgia symptoms. Dr. Chatta opined that Plaintiff suffered from fibromyalgia, and documented a history of Plaintiff's reports of pain, trouble sleeping, and headaches starting in 2001. On September 10, 2004, Chatta opined that Plaintiff was temporarily incapacitated until the same date in 2005, due to chronic back and leg pain and chronic headaches. On August 8, 2006, Chatta completed a functional capacity evaluation indicating that Plaintiff was incapable of continuous and ongoing work due to her fibromyalgia, arthritis, headaches, and chronic pain. Dr. Chatta concluded that Plaintiff's symptoms required that she be able to sit and stand at will and be permitted to lie down for three hours per day. She also indicated significant limitations in lifting, carrying, and manipulation. Plaintiff was also referred to Dr. Mitra who confirmed Dr. Chatta's diagnoses and indicated similar symptoms. Dr. Bowden indicated similar restrictions to those of Dr. Chatta, but also indicated that Plaintiff had serious physical limitations from as early as December 1, 2003.

**The ALJ's Determination**

The ALJ chose not to fully credit plaintiff's testimony and the reports of her treating physician and treating chiropractor when determining plaintiff's residual functional capacity. The ALJ made this determination based on: 1) the testimony of Dr. Balk, the medical expert; 2) evidence of plaintiff's range of daily activities; 3) plaintiff's tolerance of medication without side effects; 4) Dr. Bowden's status as a chiropractor; 5) negative findings in diagnostic testing; 6) and the opinions of the Disability Determination Consultants that Plaintiff could perform light

work. The ALJ's decision to discount, however partially, plaintiff's testimony and the report of Dr. Chatta based upon these reasons was not supported by substantial evidence. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2nd Circuit 2002) (reversible error when the ALJ failed to given controlling weight to treating physician's opinion and required objective evidence beyond clinical findings for diagnosis of fibromyalgia.)

The ALJ's first reason for discounting plaintiff's testimony and the assessments of his treating sources was the testimony of Dr. Balk. The ALJ giving full weight to the testimony of Dr. Balk, who concluded that plaintiff did not have any combination of impairments that would meet the impairments listed in the applicable federal regulations and that the "objective evidence" failed to support Dr. Chatta's assessment of plaintiff's residual functional capacity, was erroneous as a matter of law. First, Dr. Balk never treated or examined Plaintiff, and as such, should have been given less weight than the reports of plaintiff's treating doctors. *See* 20 C.F.R. § 404.1527(d)(2) ("we give more weight to the opinions from your treating sources since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairments"). Second, Dr. Balk's testimony indicated a disbelief that any patients suffering from fibromyalgia would ever suffer from functional limitations, beyond those of their own perception, as a result of that disease. (R. 327-30). He testified that there could be no measurement of physical impairments because nothing was indicated in objective testing. (R. 330). In the Circuits that have dealt with fibromyalgia and its place within the scheme of social security disability determinations, it is generally agreed that fibromyalgia, on its own, can produce functional limitations that would be disabling. *See Green-Younger*, 335 F.3d at 108 (recognizing that fibromyalgia is a disabling impairment that cannot be confirmed by objective tests.); *Rogers*, 486 F.3d at 243 (recognizing that fibromyalgia can be a severe impairment that objective testing cannot indicate); *Sarchet*, 78 F.3d at 307 (recognizing that "some people may have such a severe case of fibromyalgia as to be totally disabled from working."); *Garza v. Barnhart*, 397 F.3d. 1087, 1089 (8th Cir. 2005) (recognizing a long history of the 8th Circuit acknowledging that fibromyalgia may be disabling); *Benecke*, 379 F.3d at 596 (reversing the decision of the District Court and remanding to the Commissioner for immediate award of benefits based on fibromyalgia.)

13

Additionally, this testimony ignores the principle that fibromyalgia and its severity is tested by tender point evaluations and clinical documentation by treating physicians. *See Preston*, 854 F.2d at 817-818; *Sarchet*, 78 F.3d at 306; Social Security Ruling ("SSR") 96-4p n.2 (July 2, 1996) (claimant's subjective complaints of pain represent objective "medical signs" within meaning of 20 C.F.R. §404.1528 (b) when manifestations of these symptoms can be "shown by medically acceptable clinical or diagnostic techniques"); SSA Fibromyalgia Memorandum (findings from trigger point evaluations constitute "objective" medical signs of fibromyalgia). Therefore, both the credit given to the testimony of Dr. Balk and the reliance of the ALJ on the lack of objective medical findings were improper with regard to plaintiff's fibromyalgia.[4] By giving the testimony of Dr. Balk more credit than that of plaintiff's treating doctor in her reports, the ALJ essentially required the production of objective testing and evidence existing beyond the reported pain and symptoms required for diagnosis. The same rationale would apply for the ALJ's treatment of the Disability Determination Service medical consultants' findings that Plaintiff could do light work. While these doctors are entitled to "some weight," they were not plaintiff's treating physicians and therefore, to the extent that they base their opinions on the lack of objective findings are not be given "controlling weight" over the opinions of Dr. Chatta. As such, the ALJ's decision to discredit plaintiff's testimony and the assessments of her treating doctor based upon Dr. Balk's testimony and the reports of other non-treating physicians is not supported by substantial evidence.

The ALJ also found that plaintiff's testimony and that of her treating physician were lacking because plaintiff could perform certain daily activities. Specifically, the ALJ indicated that plaintiff drives, shops, and socializes with friends on a regular basis. However, plaintiff indicated difficulty in shopping and that she required assistance. Additionally, she met with friends once a week, who similarly had fibromyalgia. The performance of minor household chores, and once a week socializing with friends does not undermine plaintiff's credibility. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988) (reversible error when ALJ rejects medically credited symptoms based upon claimant's testimony that he "took care of his personal

---

[4]The Court notes that the ALJ did not differentiate in his assessment between plaintiff's fibromyalgia and the other stated severe limitations. This, in and of itself, was in error as certain of plaintiff's severe limitations can be tested by objective diagnostic testing, whereas fibromyalgia cannot.

14

needs, performed household chores, and occasionally went to church.") In reality, Plaintiff testified that she suffered from one migraine headache a week which required a day in bed, and had to lie down for several hours a day in between performing household chores. Therefore, plaintiff's daily activities do not undermine plaintiff's credibility nor the credibility of her physician's report. Her activities also do not support a residual functional capacity of light or sedentary exertional work on a regular and continuing basis. *See Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1985) ("disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.")

The ALJ further found plaintiff's crediblity and that of her treating physician lacking because plaintiff did not participate in a pain management program and had no side effects from her medication. Although it is true that at times Dr. Mitra and Dr. Chatta found, at certain times, that plaintiff was tolerating her medications without side effects, there were also many instances where plaintiff reported suffering from "grogginess" from the medication and that the medication was not providing relief. Furthermore, while plaintiff was not participating in a pain management program, she was being monitored on several different types of pain medications and muscle relaxants by Drs. Chatta and Mitra. On several occasions she also received injections of localized pain medications. Additionally, she tried physical therapy for several periods. In any case, the ability to tolerate medication does not establish the success of such medication in alleviating symptoms. Nor does it correlate to an ability to perform work-related activities, such as light or sedentary exertional work. In fact, plaintiff's medical records indicate that injection treatment only provided temporary relief as did many of plaintiff's medications and physical therapy. As such, the ALJ's decision to discredit plaintiff's testimony and the assessments of Dr. Chatta, based on these arguments, lack substantial evidence in the record.

Finally, the ALJ rejected the written reports of Dr. Bowden because he was a chiropractor and due to a lack of objective treatment evidence on Dr. Bowden's part. While the ALJ correctly noted that a chiropractor's opinion is not an acceptable medical source in the social security context, information from a chiropractor may be considered relevant evidence. *Hartranft v. Apfel*, 181 F.3d 358, 361 (3d Cir. 1999). The Social Security Administration defines a chiropractor as an "other source" from whom information may help the Commissioner understand how a claimant's impairment affects his ability to work. *See* 20 C.F.R. §

15

404.1513(e)(3). Therefore, the fact that Dr. Bowden was a chiropractor does not, in and of itself, require that his opinions be discounted.

Dr. Bowden completed two functional capacity evaluations, one stating plaintiff's functional limitations as of August 2006 and one backdating functional limitations to December 1, 2003. Only one medical record exists for the period prior to plaintiff's date last insured on December 31, 2003. At this visit, plaintiff reported intermittent leg pain that had been occurring for years and Dr. Chatta noted calf tenderness. However, plaintiff was not examined for tender points associated with fibromyalgia, nor tested to discount other potential diseases. Plaintiff did not report chronic headaches. No functional limitations were indicated by Dr. Chatta at the time. Since there was no treatment evidence from Dr. Bowden to support his eventual functional capacity conclusions from this period, the ALJ could have properly discounted the report of Dr. Bowden relating to December 1, 2003. Since the report of Dr. Bowden is the only place in which there are backdated statements pointing to plaintiff's alleged functional limitations prior to her date last insured, the ALJ could have also properly found that plaintiff was not entitled to DIB. This does not suggest that plaintiff's claims of pain stemming from her 1990 accident until December 31, 2003 were not credible, but that the lack of tender point testing or testing of any other kind to rule out other diseases or disorders from this period cannot support her testimony. However, the ALJ did not differentiate between Dr. Bowden's first and second report. Instead, he generally cited the lack of objective evidence and Dr. Bowden's status as a chiropractor in his discounting of the evidence. As such, the ALJ did not properly support his decision to totally discount the reports of Dr. Bowden. Although, the reports were not entitled to controlling weight, the ALJ was required to properly explain the discounting of that evidence.

### New Evidence

The Court also notes that the plaintiff has supplied new evidence to support a finding of disability. Specifically, plaintiff has provided the report of Dr. Dennis Demby, who performed a consultative evaluation of Plaintiff on July 25, 2007. (R. 288-291). In his evaluation, Demby notes that plaintiff has a history of fibromyalgia, fatigue, and recurrent headaches. He indicated that plaintiff reported difficulty walking and going up the steps and could only walk for about ½ a block before having to stop due to severe pain. He indicated that plaintiff had pain at night that kept her awake, low back pain making it difficult to bend, and could only sit for approximately

15 minutes in a hard chair. If not sitting in a hard chair, plaintiff experienced radiating pain down her legs and neck pain after approximately 15 minutes of sitting. After 50 minutes, she experienced blurred vision. She reported that he arms would go numb at night and she wore braces as a result. Upon examination, Demby noted pain in the movement of most of plaintiff's joints, and pressure points in her back. He further indicated that plaintiff walked with a limp due to knee pain and had positive straight-leg tests both in the seated and supine positive. In assessing plaintiff's ability to perform work related physical activities, Dr. Demby indicated that plaintiff was limited to carrying 2 to 3 pounds occasionally. He also indicated that she could stand and walk one hour or less and sit for one hour or less. He further indicated that she was limited in the upper and lower extremities secondary to her back, arms, and legs and that she would not be able to climb, balance, stoop, kneel, crouch, or crawl. He abilities to reach, handle, finger, see, and hear would also be affected. (R. 288-291).

For the report of Dr. Demby to be evaluated to determine whether to remand the decision under sentence six of 42 U.S.C. § 405(g), it would be necessary for the information submitted to meet three criteria: it must be new, material, and the failure to submit the documentation during the administrative proceeding must be for "good cause". *Shuter v. Astrue*, 537 F.Supp.2d 752, 756-57 (E.D.Pa., 2008). In order for evidence to be considered "new evidence," it must not be merely cumulative of what is already in the record; corroborating evidence may constitute "new evidence, while clarifying evidence may not. *Id.* at 757. The Court finds that the extra-record evidence of Dr. Demby's evaluation meets this standard as Dr. Demby's report corroborates the records of Dr. Chatta, plaintiff's treating physician.

**The ALJ's Hypothetical Question to the VE**

Plaintiff argues that the ALJ's hypothetical to the vocational expert was incomplete as it did not include specific reference to Plaintiff's limitations as set forth by Dr. Chatta. The "[t]estimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). "The ALJ will normally ask the expert whether, given certain assumptions about a claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy." *Id.* Although "the ALJ may proffer a variety of assumptions to the expert, the

expert's testimony concerning alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Id.*; *see also Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). If a hypothetical question does not reflect all of a claimant's impairments that are supported by the record, "the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987); *see also Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004); *Burns*, 312 F.3d at 123.

In his hypothetical questions to the VE, the ALJ did not include all of the limitations proposed by Dr. Chatta, nor as discussed above, did he properly discount those limitations. In the fourth and most limiting hypothetical, the ALJ stated:

> In this hypothetical, the maximum lifting is ten pounds, repeated maximum lifting is five pounds. The individual would have to have a sit, stand option. The individual would lay down in the morning for at least 30 minutes and in the afternoon for at least 15 minutes for rest periods.

(R. at 345). In response, the VE stated, "these jobs actually allow a 15 minute break in the morning and a fifteen minute break in the afternoon and from a half hour to an hour lunch period. If a person would need rest periods in excess of that they would – on a chronic basis they would not be able to do the job." As such, when reassessing plaintiff's credibility and the report of Dr. Chatta on remand in a manner consistent with plaintiff's diagnosis and the testing available, if the ALJ finds that Dr. Chatta's report is entitled to controlling weight, then plaintiff would be incapable of performing gainful employment according to the testimony of the VE.

### Conclusion

For the preceding reasons, this Court grants plaintiff's motion for summary judgment (Doc. No. 10) insomuch as it requests a remand for disposition of these issues not inconsistent with this opinion. As such, the Court vacates the decision of the ALJ as to plaintiff's applications for benefits and remands for a decision consistent with this opinion. On remand, the ALJ is instructed to base his credibility determinations, in part, on an examination of the evidence that is consistent with a diagnosis of fibromyalgia, which does not manifest itself in standard

diagnostic testing. Furthermore, the ALJ must also consider the report of Dr. Demby in determining whether plaintiff is disabled within the meaning of the Act.

AND NOW, this _11_ day of May, 2009, IT IS HEREBY ORDERED that plaintiff's motion for summary judgment is GRANTED in part and DENIED in part. The decision of the ALJ is vacated as to plaintiff's applications for benefits and the case is remanded for a decision not inconsistent with this opinion. On remand, the ALJ is to make a credibility determination of plaintiff's testimony and properly weigh Dr. Fozia Chatta's reports in a manner consistent with a diagnosis of fibromyalgia, which does not manifest itself in standard diagnostic testing, and to consider the medical opinion of Dr. Demby. Defendant's motion for summary judgment is DENIED.

BY THE COURT:

_____, J.

cc: All Counsel of Record